Mr. Karl D. Welzenbach Executive Director Volusia County MPO 1190 Pelican Bay Drive Daytona Beach, Florida 32119-1381
Dear Mr. Welzenbach:
You have asked for my opinion on substantially the following questions:
1. Does section 339.175, Florida Statutes, require the Volusia County Metropolitan Planning Organization (MPO) to enter into written agreements with both public and private airports?
2. Does the statute provide criteria for determining which public airports may be subject to such agreements, for example, airports at which a certain number of flights arrive per day?
3. Does the statutory requirement for agreements with seaports require the Volusia County Metropolitan Planning Organization to enter into a written agreement with the Ponce DeLeon Inlet and Port District Authority?
In sum:
1. and 2. Section 339.175(9), Florida Statutes, requires the Volusia County Metropolitan Planning Organization to enter into written agreements with all public airports within its geographical jurisdiction. There is no requirement in section339.175, Florida Statutes, that the MPO enter into agreements with private airports, nor is there any limitation on public airports included within the scope of the statute.
3. The Volusia County Metropolitan Planning Organization must enter into a written agreement with the Ponce DeLeon Inlet and Port District as required by section 339.175, Florida Statutes.
According to your letter, you are responsible, as Executive Director of the Volusia County Metropolitan Planning Organization, for ensuring that the organization is performing its duties in accordance with law. Section 339.175, Florida Statutes, mandates that all metropolitan planning organizations (MPOs) enter into written agreements with certain governmental entities. Your questions relate to the performance of this duty.
Section 339.175, Florida Statutes, states the intent of the Legislature to encourage and promote the development of transportation systems. To accomplish this objective, the statute states that metropolitan planning organizations shall
"develop, in cooperation with the state and public transit operators, transportation plans and programs for metropolitan areas. The plans and programs for each metropolitan area must provide for the development and integrated management and operation of transportation systems and facilities . . . that will function as an intermodal transportation system for the metropolitan area. The process for developing such plans and programs shall provide for consideration of all modes of transportation and shall be continuing, cooperative, and comprehensive, to the degree appropriate, based on the complexity of the transportation problems to be addressed."[1]
The authority and responsibility of an MPO is "to manage a continuing, cooperative, and comprehensive transportation planning process that results in the development of plans and programs which are consistent . . . with the approved local government comprehensive plans of the units of local government the boundaries of which are within the metropolitan area of the M.P.O."[2] The MPO is designated as the "forum for cooperative decisionmaking by officials of the affected governmental entities[.]"[3] The Legislature expressly stated that "each M.P.O. shall be involved in the planning and programming of transportation facilities, including, but not limited to, airports, intercity and high-speed rail lines, seaports, and intermodal facilities, to the extent permitted by state or federal law."[4]
Questions One and Two
Section 339.175(9)(a), Florida Statutes, requires each MPO to execute certain written agreements, which shall be reviewed and updated as necessary every five years. Included in this provision is
"[a]n agreement with operators of public transportation systems, including transit systems, commuter rail systems, airports, seaports, and spaceports, describing the means by which activities will be coordinated and specifying how public transit, commuter rail, aviation, seaport, and aerospace planning and programming will be part of the comprehensive planned development of the metropolitan area."[5]
An MPO is also authorized to "execute other agreements required by state or federal law or as necessary to properly accomplish its functions."[6]
Your letter states that Volusia County currently has five publicly owned and operated airports and several privately owned and operated airports. You question whether the MPO must enter into agreements with both public and private airports and whether there are any limitations on which airports may participate.
Section 339.175(9)(a)3., Florida Statutes, requires that the MPO enter into agreements with the operators of "public transportation systems" and goes on to specify some of those systems: transit systems, commuter rail systems, airports, seaports, and spaceports. Thus, the statutory list of types of systems merely provides examples of those public transportation systems included within the scope of the statute. The purpose of this agreement is to describe the means for coordinating and specifying how these public transportation systems will be part of the comprehensive planned development of the metropolitan area.
It is my opinion, based on the clear language of the statute, that the Volusia County MPO must enter into written agreements with all public airports.[7] Nothing in the statutory language limits the airports to which this requirement applies.
The statute also allows the MPO, in its discretion, to "execute other agreements . . . as necessary to properly accomplish its functions."[8] Thus, if the MPO determines it is appropriate to include private airports within the scope of its transportation systems plan, it is authorized to enter into written agreements with private airports as well as public ones.
Question Three
You have also indicated that Volusia County does not have a public seaport but does have the Ponce de Leon Port Authority. You ask whether the MPO must enter into a written agreement with the port authority.
As discussed above, section 339.175(9)(a)3., Florida Statutes, provides a clear directive to MPOs to enter into written agreements with operators of public transportation systems, describing the coordination of public transportation activities as part of the comprehensive planned development of the metropolitan area.
Although the word "seaport" is used throughout the statutes, I can find no definition of this term.[9] The word is used in several places in section 339.175, Florida Statutes, and always appears to be used as it is commonly understood rather than in a technical sense.
Words of common usage, when used in a statute, should be construed in their plain and ordinary sense.[10] The plain and ordinary meaning of a word can be determined by reference to a dictionary.[11] The word "seaport" is defined as: "a port, harbor, or town on the seacoast or accessible (as by a connecting river) to seagoing ships and active in shipping or other marine activities";[12] and "[a] harbor or town having facilities for seagoing ships."[13]
While you have provided this office with no information about the "Ponce de Leon Port Authority," I assume that you refer to the Ponce DeLeon Inlet and Port District. The district was created by Chapter 69-1705, Laws of Florida, and operates under provisions of statutory law.[14] It carries out inlet maintenance, port and navigation functions.
According to section 11 of Chapter 69-1705, Laws of Florida, the powers of the Ponce DeLeon Inlet and Port District Authority include
"the responsibility of formulating and carrying out plans for the longrange development of the facilities of ports and recreational facilities within the district and traffic through the said ports."
The authority is also empowered to "enter into joint agreements and arrangements with steamship lines, railroads or other transportation lines, or any common carrier [.]"[15]
While this office cannot make a fact-based determination of whether the Ponce DeLeon Inlet and Port Authority constitutes a seaport, the duties and responsibilities of the port as reflected in the law would appear to be in the nature of a seaport. Pursuant to section 315.02(6), Florida Statutes, under which this port operates, "port facilities" may include
"harbor, shipping, and port facilities, and improvements of every kind, nature, and description, including, but without limitation, channels, turning basins, jetties, breakwaters, public landings, wharves, docks, markets, parks, recreational facilities, structures, buildings, piers, storage facilities, including facilities that may be used for warehouse, storage, and distribution of cargo transported or to be transported through an airport or port facility, public buildings and plazas, anchorages, utilities, bridges, tunnels, roads, causeways, and any and all property and facilities necessary or useful in connection with the foregoing[.]"
In light of the nature and duties of the Ponce DeLeon Inlet and Port District with regard to transportation in Volusia County, it is my opinion that the Volusia County Metropolitan Planning Organization must enter into a written agreement with the port authority pursuant to section 339.175, Florida Statutes.
Sincerely,
Robert A. Butterworth Attorney General
RAB/tgh
[1] Section 339.175, Fla. Stat.
[2] Section 339.175(4), Fla. Stat.
[3] Id.
[4] Section 339.175(5), Fla. Stat.
[5] Section 339.175(9)(a)3., Fla. Stat.
[6] Section 339.175(9)(b), Fla. Stat.
[7] This conclusion is supported by the repeated reference within section 339.175 to "public transportation operators," and "public transit authorities," and the clear reference to private entities when the Legislature intended to include private providers. See, e.g., ss. 339.175(5)(e), (7), (7)(c)3., and (7)(c)7., Fla. Stat.
[8] Section 339.175(9)(b), Fla. Stat.
[9] See, e.g., s. 20.23, Fla. Stat., relating to the Department of Transportation; ss. 163.3177, 163.3180 and 163.3187, Fla. Stat., dealing with concurrency; s. 311.09, Fla. Stat., creating the Florida Seaport Transportation and Economic Development Council; and s. 339.155, Fla. Stat., relating to transportation planning.
[10] Pedersen v. Green, 105 So.2d 1, 4 (Fla. 1958).
[11] Green v. State, 604 So.2d 471 (Fla. 1992); Gardner v.Johnson, 451 So.2d 477 (Fla. 1984).
[12] Webster's Third New International Dictionary 2048 (unabridged ed. 1981).
[13] The American Heritage Dictionary of the English Language 1170 (new college edition 1979).
[14] According to the Official List of Special Districts compiled by the Florida Department of Community Affairs the district derives its statutory authority from Chapters 315 and 374, Part III, Florida Statutes. However, I would note that there is currently no Part III, Chapter 374, Florida Statutes.
[15] Section 11(8), Ch. 69-1705, Laws of Florida.